FILED

2010 Sep-24  PM 03:36
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

WILLIAM JOSEPH JOHNSON, JR.,      )
                                  )
            Plaintiff,            )
                                  )
v.                                ) CIVIL ACTION NO. 2:07-CV-1213-TMP
                                  )
SOUTHERN NUCLEAR OPERATING        )
COMPANY, INC.,                    )
                                  )
            Defendant.            )

## MEMORANDUM OF OPINION

This matter is before the court on the motion for summary judgment filed by defendant Southern

Nuclear Operating Company, Inc. ("Southern Nuclear") on March 16, 2010.  The matter has been fully

briefed.  The parties have consented to the jurisdiction of the undersigned magistrate judge.  (Doc. 80).

## INTRODUCTION

This case has been remarkably contentious.  Having reviewed the voluminous filings associated

with the instant motion, the court concludes that the parties agree on only one thing: that this is essentially

a simple case.  It is an employment discrimination case, arising from the Americans with Disabilities Act,

in which it appears that only two claims are asserted.[1]  Even so, the case has followed a torturous

---

[1]      As discussed below, even the number of claims asserted is not clear.  While the complaint,
as amended, contains only two counts, plaintiff argues that there are at least six claims contained in
it.

procedural path  from the date the original *pro se* complaint was filed in a federal district court in Georgia on June 1, 2007, and transferred to this court on June 27, 2007.

Plaintiff's original *pro se* complaint named as defendants his employer, Southern Nuclear Operating Company, Inc. ("Southern Nuclear"), and five individuals.  The matter was transferred to this court on June 27, 2007, and the *pro se* plaintiff filed a motion for appointment of counsel, which was granted.  After plaintiff obtained counsel, his counsel filed an amended complaint on April 2, 2008, setting out two numbered and labeled counts.[2]  Count One of the amended complaint clearly labels the claim alleged there, "AMERICANS WITH DISABILITIES ACT HARASSMENT AND HOSTILE ENVIRONMENT."  In the first claim, the plaintiff alleges harassment and hostility, based on his status as a disabled person, that "permeated" the work environment and was "severe and pervasive." He further asserts that he "had an actual or perceived disability and was denied an employment opportunity and placed on leave ... [and] was refused accommodation due to SNC's perception that Plaintiff was disabled." (Amended Complaint, Doc. 7, ¶35).  Count Two of the first amended complaint is clearly labeled, "RETALIATION," in which the plaintiff vaguely asserts that he "exercised his statutory rights by complaining to SNC about disability discrimination and thus was subjected to retaliation by SNC." (Amended Complaint, Doc. 7, ¶41).

The amended complaint was followed by a motion to dismiss or, in the alternative, for a more definite statement, filed by Southern Nuclear.  The undersigned filed a Report and Recommendation on December 29, 2008, recommending the dismissal of all claims against all defendants except Southern

---

[2]    The amended complaint also expressly omitted the claims previously asserted against the individual defendants in the *pro se* complaint.  Thus, with the filing of the amended complaint, the only defendant remaining in the action was Southern Nuclear, the other defendants having been dropped from the case.

Nuclear, and it further granted the motion for more a definite statement and directed plaintiff to amend the complaint within 20 days to more clearly state the nature of his claims. A second amended complaint was filed on January 19, 2009. The second amended complaint incorporated by reference the facts and claims set forth in the amended complaint, and restated the retaliation claim in Count Two to allege specifically that plaintiff filed an EEOC charge of discrimination on October 12, 2006, and that Southern Nuclear informed him on October 17, 2006, that his Family and Medical Leave Act [FMLA] leave had ended and that he should apply for long-term disability. (Second Amended Complaint, Doc. 21, ¶25) . It is important to note that the newly amended complaint did not mention any internal complaint made by Johnson to Southern Nuclear in January 2006 when he completed a Compliance Questionnaire, nor is it mentioned in the earlier complaints.[3] Even reading the amended complaints together, they appear to plead only two claims, hostile work environment/harassment due to his actual or perceived disability and retaliation due to complaints to the EEOC about disability discrimination.

The second amended complaint drew a second motion to dismiss or, in the alternative, for a more definite statement. In ruling on the motion for a more definite statement, this court, on February 26, 2009, specifically stated that "the court reads the second amended complaint (in conjunction with the first amended complaint incorporated in it) to allege two essential claims: (1) that defendant created or allowed a hostile work environment based on the plaintiff's perceived or alleged disability, in violation of the Americans With Disabilities Act; and (2) that defendant retaliated against plaintiff for complaining about

---

[3]     Plaintiff has attempted to allege for the first time in briefing the instant motion that his answers on the internal Compliance Questionnaire is a basis for his retaliation claim. For all the reasons set forth herein, the court finds that the January 2006 "complaint" was not alleged as a basis for retaliation in the Second Amended Complaint as directly ordered by the court and cannot now be asserted.

3

violations of the Americans with Disabilities Act." (Order, Doc. #27).  Plaintiff did not file any motion to reconsider the order, did not voice any concern over the court's assessment of the complaint, and did not seek to further amend the complaint.[4]   In response to the defendant's motion for summary judgment, the plaintiff has attempted to argue numerous other legal theories.  For reasons discussed  herein, these claims simply have never been pleaded in this lawsuit and cannot be raised for the first time in response to a motion for summary judgment.


## CLAIMS PLEADED IN THIS ACTION

In order to frame the defendant's motion for summary judgment, the court must first determine what claims are properly before the court.  Not surprisingly, the parties disagree about whether certain claims have been pleaded.  While defendant argues that the second amended complaint alleges on two claims, for harassment/hostile work environment based on actual or perceived disability and retaliation, plaintiff contends that his complaint also states claims for disability discrimination, failure to accommodate, use of improper qualification standards, and making illegal medical inquiries.  For the reasons explained below, the court finds there are only two claims before the court.

The pleading of a claim is governed by Federal Rules of Civil Procedure 8 and 10.  Rule 8 requires that a complaint contain:

---

[4]      Counsel for defendant argued at some length during the plaintiff's deposition that no "accommodation" claim is at issue in this case.  In spite of that additional notice that the only claims asserted were for hostile environment and retaliation, plaintiff again failed to seek to further amend the complaint.

> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> (3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

F. R. Civ. P. 8(a).  Rule 10 overlays additional requirements onto the short, plain notice rule, stating in relevant part:

> (b) **Paragraph; separate statements.**  A party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances.  A later pleading may refer by number to a paragraph in an earlier pleading.  If doing so would promote clarity, each claim founded on separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

F. R. Civ. P 10(b).

The Eleventh Circuit Court of Appeals has examined the pleading requirements set forth in Rules 8 and 10 and has determined that rules governing the complaint must be strictly enforced by the courts to avoid the confusion and waste of resources occasioned by "shotgun" pleadings.  See Davis v. Coca-Cola Bottling Co. Consolidated, 516 F.3d 955 (11th Cir. 2008).  In Davis, the court examined a complaint filed by a group of plaintiffs alleging violations of Title VII in the form of racial discrimination and retaliation.  The plaintiffs attempted to argue that their complaint pleaded 16 different claims based on the denial two promotions.  Plaintiffs rested upon language in their complaint which stated simply that they were "denied promotions" and "treated differently than

similarly situated white employees" solely because of their race. 516 F.3d at 974.  The appellate

court noted that the statement in the complaint "epitomizes speculation and therefore does not

amount to a short and plain statement of their claim under Rule 8(a)."  516 F.3d at 974.  The

plaintiffs in Davis further argued that the complaint contained a retaliation claim based upon one

plaintiff's "downgrading" of job assignments to light work.  The district court had dismissed the

claim on the ground that the complaint did not sufficiently state such a claim.  The appellate court

agreed and held that "plaintiffs' opening brief points to nothing in the complaint that reasonably

could be read to allege this claim."  The court pointed out that the brief  "only addresses the merits

of the claim, as if it had been well pled."  516 F.3d at 977.   The court went on to admonish:

> If the framers of the Federal Rules of Civil Procedure could read the record in this
> case – beginning with the plaintiffs' complaint and CCBCC's answer and continuing
> to the district court's final order granting CCBCC summary judgment – they would
> roll over in their graves.  In fashioning the Rules, they assumed that complaints
> would be drafted as clearly and definitively as possible, so that the defendant could
> understand the cause(s) of action the plaintiff was asserting and frame a responsive
> pleading, and the district court, having a clear and definitive response before it, could
> recognize the parties' claims and defenses, identify the issues of fact to be litigated,
> and proceed to a just result.  The framers also assumed that the lawyers appearing
> before the district courts would adhere to the standards of professional responsibility
> and conduct, and that, as officers of the court, would be aware that the federal courts
> constitute a scarce resource for resolving disputes and that their failure to adhere to
> these standards would likely yield countless untoward, and totally unacceptable,
> consequences.
>
> This case confounds these assumptions.  The complaint is a model "shotgun"
> pleading of the sort this court has been roundly, repeatedly, and consistently
> condemning for years, long before this lawsuit was filed. [footnote omitted]  And the
> defendant's answer is no better.  Both pleadings were drafted by AV rated law firms
> whose appearances in district courts of this circuit, and in this court, have been
> ubiquitous. [footnote omitted].  The steps counsel took in litigating their respective
> clients' interests — the pleading strategies they employed — were not taken out of
> ignorance; they were deliberate, calculated.

Davis, 516 F.3d at 979-980.  The court went on to note that Rule 8(a)(2) requires that a complaint

contain "a short and plain statement of the claim showing that the pleader is entitled to relief" and

that Rule 10(b) requires the drafter to frame the complaint so that each claim "founded upon a

separate transaction or occurrence ... shall be stated in a separate count ... whenever a separation

facilitates the clear presentation of the matters set forth."   516 F.3d at 980 n.57.

The Eleventh Circuit Court of Appeals has continued to condemn shotgun pleadings, and has

specifically affirmed dismissal of ADA claims that were not sufficiently pleaded under Rule 8 and

10, even when the prohibited conduct was mentioned in factual paragraphs that were incorporated

into a numbered count.  In Grimsley v. Marshalls of MA, Inc., 284 Fed. Appx. 604 (11th Cir. 2008),

for example, the court noted that a 13-count complaint that enumerated three violations of the ADA

could not be fairly read to include a "medical inquiry" claim, even where the ADA counts

incorporated plaintiff's factual statement that a supervisor would "routinely ask in a demanding tone

whether plaintiff had taken his medication, which is a violation of the [ADA's] prohibition of

medical inquiries." 284 Fed. Appx. at n. 9.  The crucial requirement of Rule 8(a) is that the claims,

whatever they may be, are properly stated in the complaint.  No amount of discovery evidence or

deposition testimony can conjure a claim not actually pleaded in the complaint.  See Gilmour v.

Gates, McDonald and Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage,

the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance

with Fed.R.Civ.P. 15(a).").  A plaintiff's attempt to state the claim by asserting it during his or her

deposition does not serve to amend the complaint or to correct an improper pleading.  See, e.g., Brown v. Snow, 440 F.3d 1259, 1266 (11th Cir. 2006), aff'd, 440 F.3d 1259 (11th Cir. 2006).

In this case, Johnson, through able and experienced counsel, set forth two separate counts, the first based on an alleged "hostile environment" and "harassment,"[5] and the second based upon retaliation for having "filed a charge of discrimination with the EEOC."  The defendant challenged the clarity of the complaint by seeking a more definite statement, and the court not only ordered a more definite statement during the second round of pleadings, but put plaintiff on notice during the third round that the court read the complaint to contain *only two* counts.  Plaintiff has never presented a short, plain statement of a claim based upon the accommodation requirements of the ADA, and he certainly did not set forth such a claim in a separate count, even though that claim clearly is based on a separate occurrence.[6]  Two separate violations of a statute put into a single count is "confusing for both the Court and for the Defendants and does not give fair notice to the defendants that against which they must defend."  Pierson v. Orlando Regional Healthcare Systems, Inc., 619 F. Supp. 2d 1260, 1274 (M.D. Fla. 2009)(dismissing on other grounds a complaint that alleged two violations of the Sherman Act in one count, where the sections "proscribe very different

---

[5]/     Count One is set forth only in the Amended Complaint; it is incorporated by reference in the Second Amended Complaint, but is not further described.

[6]/     The court is aware that the Eleventh Circuit Court of Appeals recently allowed an ADA claim to be asserted without a specific pleading of it in a separate count.  Harrison v. Benchmark Electronics Huntsville, Inc., 593 F.3d 1206, 1214 (11th Cir. 2010).  The court noted that the plaintiff had "alleged that BEHI questioned him about his seizures... and claimed damages for these allegedly prohibited medical inquiries... [giving] BEHI fair notice" of the claim.  In this case, however, given the extensive history of the pleadings and the court's specific delineation of the claims in the February 2008 order, such a liberal reading of the complaint would reward the plaintiff for not doing the very things required by Rules 8(a) and 10(b), and would defy the clear mandate of Davis.

conduct"). In <u>Davis</u>, the Eleventh Circuit Court of Appeals concluded that "[t]hese rules work together to require the pleader to present his claims discretely and succinctly, so that his adversary can discern what he is claiming and frame a responsive pleading, the court can determine which facts support which claims and whether the plaintiff has stated any claims upon which relief can be granted, and, at trial, the court can determine that evidence which is relevant and that which is not." 516 F.3d at 980 n.57, quoting <u>Fikes v. City of Daphne</u>, 79 F.3d 1079, 1082-83 (11th Cir. 1996).

In this case, plaintiff has failed to present discretely or succinctly what he now asserts are his claims for accommodation,[7] use of improper qualification standards, and making illegal medical inquiries. Plaintiff has had numerous opportunities to present his claims in a succinct and direct fashion. He was warned more than a year before the filing of the motion for summary judgment that the complaint would be construed in exactly the manner it is now being construed. The court cannot grant relief on, or consider for summary judgment purposes, claims that have not been pleaded.[8] The only claims that exist in this case, therefore, are plaintiff's claims that (1) defendant created or allowed a hostile, harassing work environment based on plaintiff's disability; and (2) the defendant

---

[7]     To the extent that the alleged "failure to accommodate" could be viewed as one event in a series of hostile or harassing acts, that conduct will be discussed *infra*.

[8]     This is in keeping with the general rule that it is the litigants, and not the courts, who identify their entitlement to relief at all stages of the pleadings. <u>Jones v. Secretary, Dept. of Corrections</u>, slip op. No. 10-11497 (11th Cir., June 2, 2010)(denying a *habeas* petitioner his application for a certificate of appealability and finding claims waived where he had failed to identify and explain "the claims he believes to be arguably meritorious").

retaliated against plaintiff as a result of his filing of an EEOC charge alleging violations of the ADA.[9]

<u>SUMMARY JUDGMENT STANDARD</u>

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  <u>Celotex</u>, 477 U.S. at 322-

---

[9]/      Plaintiff may argue that he should be given leave to amend his complaint yet again to set forth a claim of failure to accommodate.  The court is not so inclined in this case.  Permission to amend may have been called for under  precedent in the Eleventh Circuit Court of Appeals prior to 2002.  <u>Bank v. Pitt</u>, 928 F.2d 1008 (11th Cir. 1991).  The rule announced in <u>Bank</u> was specifically overruled in <u>Wagner v. Daewoo Heavy Industries America Corp.</u>, 314 F.3d 541, 542 (11th Cir. 2002), and was replaced with the instruction that a "district court is not required to grant a plaintiff leave to amend his complaint *sua sponte* when the plaintiff, who is represented by counsel, never filed a motion to amend nor requested leave to amend before the district court."  The instruction is especially applicable here, where plaintiff has had more than two years and numerous opportunities to amend, as well as actual notice of the limitations of the complaint.

23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.  Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The substantive law will identify which facts are material and which are irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc.

v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than

show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co.,

Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations

omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must

"view the evidence presented through the prism of the substantive evidentiary burden," so there must

be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S.

at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless,

credibility determinations, the weighing of evidence, and the drawing of inferences from the facts

are the function of the jury, and therefore the evidence of the non-movant is to be believed and all

justifiable inferences are to be drawn in his favor.  Anderson, 477 U.S. at 255.  The non-movant need

not be given the benefit of every inference but only of every reasonable inference.  Brown v. City

of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).


## SUMMARY JUDGMENT FACTS

For purposes of summary judgment, and viewing the evidence in the light most favorable to

the nonmoving party, in this case Mr. Johnson, the following facts[10] are considered undisputed:

---

[10]/      Plaintiff has failed to respond directly to the defendant's narrative statement of undisputed
facts, except to provide his own version of events, with sporadic citations to the record.  His
recitation of the facts does not sufficiently respond to defendant's motion as required by Rule
56(e)(2) by "set[ting] out specific facts showing a genuine issue for trial." Moreover, his citations
to the record are not only incomplete, but often incorrect.  The defendant has pointed out some of
the deficiencies of plaintiff's response in its reply filed May 20, 2010 (Doc. 70).

Southern Nuclear Operating Company is licensed by the Nuclear Regulatory Commission ("NRC") to operate nuclear power plants in Georgia and Alabama.  From 1982 to 2006, plaintiff was employed with Southern Nuclear.  He worked until 2001 in the security department at Plant Vogtle, in Georgia, but that year he requested a voluntary transfer to a different job within Southern Nuclear.  The requested transferred was granted, and in August 2002, he transferred to a position as an information and emergency planning assistant in Southern Nuclear's corporate communications department.  In his new position, plaintiff worked mostly outside the nuclear plant, although he retained clearance to go into secure areas of the plant, which he did on occasion.  Upon being transferred, plaintiff's supervisor became corporate communications manager Steve Higginbottom.  Beginning in 2002, Higginbottom knew that plaintiff took pain medications for problems with his back, because plaintiff told Higginbottom about his medical problems soon after they began working together.  In 2003, Higginbottom awarded plaintiff a "top performer" bonus, recognizing him as a good worker and providing him with a cash award.

On July 5, 2004, plaintiff had a handgun in a company vehicle on company property.  Possession of the handgun violated one of Southern Nuclear's policies, and Higginbottom reported plaintiff's possession of the handgun on July 12, 2004.  Plaintiff received an oral "reminder" dated August 2, 2004, for his possession of a handgun on company property.  Plaintiff thought that receipt of an oral reminder was "lenient."

Seven days after Higginbottom's report of the handgun, plaintiff complained on July 19, 2004, to Southern Nuclear's corporate concerns department that Higginbottom had failed to inform him about a reduction in his pay and job level.  He asserts that he was told in 2001 that he would not

suffer any pay cuts or reductions in his job level.  He does not allege that Higginbottom was responsible for the pay cut, but only that he failed to timely inform plaintiff of it.  This complaint resulted in an investigation, during which plaintiff subsequently complained that Higginbottom had retaliated against him for filing the complaint[11] about the pay reduction.  None of plaintiff's statements during the concern investigation indicated that plaintiff was complaining about any disability discrimination, but, rather, Higginbottom's failure to follow Southern Nuclear's rules about timely advice to employees about pay reductions and Higginbottom's alleged retaliation for plaintiff's having made the pay-reduction complaint.  As a result of the investigation, the defendant restored Johnson's pay and job level for one year, based upon its finding that Higginbottom should have timely informed Johnson about the pay reduction.

Shortly after plaintiff made his complaint about Higginbottom, on July 27, 2004, Regina Waller sent an email to Higginbottom in which she told him that plaintiff thought he (plaintiff) was the target of a "witch hunt."  Higginbottom believed the term "witch hunt" was referring to his conduct as plaintiff's manager, and further believed that use of the term was inappropriate in the workplace.  There is no indication that Higginbottom took any action or responded to the email.

Prior to February 2005, some of plaintiff's co-workers complained to Higginbottom about plaintiff.  In February 2005, Higginbottom informed plaintiff that he would not be receiving a top performer bonus for 2004.  Higginbottom said he did not award the top performer bonus to plaintiff in 2004 because plaintiff's behavior and attitude did not meet the requisite standard.  Plaintiff alleges that Higginbottom became withdrawn from plaintiff and was short with him during telephone

---

[11]/   In Southern Nuclear's corporate culture, personnel complaints are termed "concerns."

conversations in 2005.  Plaintiff was referred to the company's employee assistance program ("EAP") in February 2005 because of concerns about plaintiff's self-reported stress and financial problems.  On two occasions in February 2005, plaintiff visited a stress counselor, Sue Moore, who was selected by the EAP provider.

In February 2005, plaintiff complained to Southern Nuclear that Higginbottom had not given him the top performer bonus for 2004.  Plaintiff also complained that Higginbottom had reported him for having a gun in his company vehicle in retaliation for filing the concern in July 2004.[12]  Also in February 2005, plaintiff complained to Southern Nuclear that he had been referred to the EAP provider and that Higginbottom was a poor manager.  In filing the complaints, plaintiff did not make any allegation that he had been harassed or discriminated against because of a disability, or that he had been retaliated against for filing a disability discrimination or harassment complaint.

In March of 2005, Higginbottom instructed plaintiff, as part of his job duties, to send calendars to certain residents near the nuclear plant in Georgia.  There had been some internal dispute as to whether older versions or newer versions of the calendar were to be sent.  Plaintiff was required to do extra work in order to correct problems with the calendar distribution, and another employee who made mistakes in the calendars was disciplined.  After he complained about the efforts he had made to comply with the calendar distribution, defendant awarded plaintiff extra pay for the additional time spent on the calendars.

---

[12]/      Plaintiff made this complaint even though the evidence now is undisputed that Higginbottom reported the handgun incident *before* plaintiff made his complaint about Higginbottom's failure to tell him about the pay reduction.

Plaintiff stopped reporting to Higginbottom in June 2005 when Chris Boone became his direct supervisor.  Boone, using input from Higginbottom, completed an NRC-mandated annual supervisor review ("ASR") on plaintiff.[13]  The ASR stated that plaintiff had changed with respect to "sociability (poor eye contact, holds grudges)," "how others react to worker (avoid, mistrust)," "shows more anger (over-reacts to real or imagined criticism)," and "increased worker complaints (physical ailments, money problems)."  A supervisor is required to report any observed changes in an employee's behaviors on the ASR form.

Southern Nuclear's medical director instructed plaintiff to undergo a fitness-for-duty evaluation in August 2005 as a result of the information noted on the ASR, statements made by plaintiff in emails he had authored, and plaintiff's admission regarding carrying a weapon in a company vehicle.  The August 2005 fitness-for-duty evaluation did not result in any removal from duty, and plaintiff continued to receive pay during that time. Plaintiff was seen by several doctors, including two psychiatrists, and was cleared to return to work even while continuing his then current medication.

Early in 2006, Johnson completed a mandatory "Compliance Questionnaire" concerning his employment during 2005.  In that form, Johnson complained that Higginbottom had subjected him to discrimination because of his disabilities.  The complaint generated an investigation by Hugh Bryant, Concerns Program Supervisor and Compliance Manager, who ultimately concluded on March 27, 2006, that Johnson's claims were unfounded.

_____

[13]/   Plaintiff argues in brief that this is a disputed fact, and that Higginbottom, not Boone, completed the June 2005 ASR.  Both Higginbottom and Boone testified clearly in their depositions that Boone completed the ASR after meeting and consulting with Higginbottom.  See Boone Dep. at pp. 80-92; Higginbottom Dep. at pp. 26-33.

In April 2006, plaintiff continued to work as an emergency planning assistant in the emergency planning department.  As an emergency planning assistant, plaintiff was required to conduct certain "licensed activities."  Some of plaintiff's job duties involved driving a company vehicle, and performing maintenance, testing, and inventory of emergency communications equipment in and around the Plant Vogtle area.  Plaintiff's managers considered the job duties to be essential to the emergency planning assistant position.  Plaintiff further was required to be "fit for duty" under the regulations of the U.S. Nuclear Regulatory Commission.

At all times relevant to this case, Southern Nuclear was required to comply with the regulations of the Nuclear Regulatory Commission found in 10 C.F.R. § 26.10(a).  Under the NRC regulations, Southern Nuclear is required to implement a fitness-for-duty program that would:

> Provide reasonable assurance that nuclear power plant personnel... will perform their tasks in a reliable and trustworthy manner and are not under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties.

10 C.F.R. § 26.10(a).  If an employee is determined to be not fit for duty under the regulations, Southern Nuclear cannot permit the employee to work in a job that requires that he be fit for duty.

On April 6, 2006, plaintiff submitted to a random drug test.[14]  In connection with the test, he completed a form in which he reported that he took the following medication prescribed at the following dosages: Gabapentin (Neurontin) @ 300 mg/day; Zoloft at 100 mg/day; Clonazapem

---

[14]/     Although plaintiff notes the proximity in time to his complaint of discrimination by Higginbottom, he does not dispute that he was randomly selected for the April 2006 test. Furthermore, defendant has demonstrated that plaintiff's random selection occurred on March 24, 2006, and the test was administered on April 6, 2006.

(Klonipin) @ 1 mg/day; Tizanadine (Zanaflex) @ 4 mg/day; Diclofenac (Volterin) @ 75 mg/day; Ambien @12.5 mg/day; Morphine Sulfate (IR) @ 30 mg/twice per day; and Morphine Sulfate (ER) @ 60 mg/every 8 hours.

Morphine Sulfate (ER), Morphine Sulfate (IR), Gabapentin, Clonazapem, Zanaflex, Zoloft, and Ambien are centrally acting medications that can cause sedation, delayed reaction time, difficulty performing complex tasks, short-term memory loss, impaired judgment, and/or other cognitive impairment. The risk of such side-effects increases when these types of medications are used in combination with each other.

The forms completed by plaintiff on August 1, 2005, August 26, 2005, and April 6, 2006, were provided to and reviewed by Dr. Calvert Dodson, the Medical Director for Southern Nuclear, in April 2006. On April 20, 2006, Dodson directed plaintiff to undergo another fitness-for-duty evaluation. During the evaluation, plaintiff reported that he "hurt 24 hours a day, 7 days a week," that his medical conditions had "gotten worse," and that sometimes he "hurt so bad I can't stand it." Dr. Lamar Murray reported to Dodson that he believed the plaintiff's medical condition was deteriorating. In connection with the fitness-for-duty evaluation in 2006, Dodson reviewed medical records Southern Nuclear received from Dr. John Downey, Dr. Richard Field, and Dr. Charles Green, all of whom were plaintiff's personal treating physicians. Medical records from Downey indicated that plaintiff reported his pain levels ranging from 7 (horrible) to 10 (excruciating) out of 10. Dodson concluded that plaintiff's conditions were progressively requiring more and more medication.[15]

---

[15]/ Plaintiff asserts that Billie Rooks, medical services supervisor at Southern Nuclear, typed the letter for Dodson to sign removing Johnson from work, essentially urged Dodson to review the case,

In connection with the 2006 fitness-for-duty evaluation, plaintiff also was evaluated by Dr. Robert W. Mooney, an addictionologist with Willingway Hospital in Georgia, who had almost 15 years of experience working with the NRC's fitness-for-duty requirements. Mooney reported that the amount and combination of medications plaintiff was taking "present[ed] a substantial risk to both him and others in an NRC regulated facility." Mooney further concluded that he was unable to certify that plaintiff was an acceptable risk for returning to his assigned duties.

Dr. Frank Webster, a psychiatrist and associate medical director for Value Options, a third-party provider relied upon by Southern Nuclear in making fitness-for-duty recommendations, reviewed plaintiff's case in connection with the 2006 fitness-for-duty evaluation. Webster determined that he was unable to provide "reasonable assurance" that plaintiff was "not under the influence of any substance, legal or illegal, which in any way adversely affects [his] ability to safely and competently perform [his] duties."

In making the final decision concerning plaintiff's fitness for duty, Dodson reviewed and relied upon the NRC's fitness-for-duty requirements, plaintiff's self-reported medication regimen, medical records from plaintiff's personal physicians, Dr. Murray's assessment of plaintiff, Dr. Mooney's assessment of plaintiff, Dr. Webster's recommendation that plaintiff be found not fit for duty,[16] information about plaintiff's behavioral issues noted in the ASR, and the essential

and sought similar intervention from Webster. Even if Rooks was the first person to seek Johnson's removal from duty, and even if she advocated for his removal, it is undisputed that the decision was made by Dodson. Moreover, none of the evidence discussed by plaintiff indicates that Rooks' opinion was discriminatory or retaliatory.

[16]/   Plaintiff's was the first fitness-for-duty evaluation using the NRC guidelines in which Webster participated. He was not initially aware of the specific requirements set forth in 26 C.F.R. § 26.10. After first examining plaintiff's medical records, Webster requested additional information

functions of plaintiff's job.  Dodson ultimately concluded that plaintiff was not fit for duty under the NRC regulations based upon plaintiff's self-reported medications, plaintiff's medical conditions, the information about doctors, and recommendations from other doctors.  After receiving Dodson's fitness-for-duty determination in 2006, Southern Nuclear determined that plaintiff could not perform the essential functions of his job as an emergency planning assistant.

Plaintiff never had one of his personal physicians contact Dodson or Webster to discuss possible alternatives to plaintiff's pain management medication regimen.  He never underwent a neuro-psychological evaluation after he was declared not fit for duty in 2006, and he never underwent a functional capacity evaluation after he was declared not fit for duty.  He also never underwent psychotherapy with a specialist in chronic pain management after being declared not fit for duty in 2006.  Southern Nuclear never undertook to determine whether Johnson was actually experiencing any of the side effects of the medications, or whether his ability to function in his job was actually impaired.  Dodson and Webster had initially ordered additional testing to determine plaintiff's functioning, but changed their minds.  Webster was not familiar with the NRC regulations prior to his involvement in the plaintiff's evaluation, and became familiar with them after talking with Billie Rooks.  Once Webster recommended that Johnson be deemed unfit for duty, Dodson made that final determination, and Johnson was indefinitely restricted from working at any nuclear power plant job that required that he be fit for duty under the NRC regulations.

---

regarding plaintiff's functioning and alternative treatments; however, after becoming acquainted with the specific requirements of § 26.10, Webster concluded that he could not "reasonably assure" that plaintiff could provide the service required under the relevant requirements and that plaintiff should be deemed unfit for duty.

Since the determination that plaintiff was not fit for duty, his condition has not improved, and he apparently continues to take medications at the dosages and frequencies prescribed by Dr. Downey. Plaintiff has apparently not sought or received any alternative treatments since he was declared unfit for duty.

Between April 21, 2006, and May 22, 2006, plaintiff and Southern Nuclear spoke on numerous occasions. Plaintiff sent Southern Nuclear a number of faxes. Plaintiff did not provide Southern Nuclear with any updates regarding any changes in his medical condition or medication regimen. None of plaintiff's personal physicians has provided Southern Nuclear with any updates regarding such changes.[17]

During an August 21, 2006, meeting with plaintiff, Jeffrey Gasser, Southern Nuclear's chief nuclear officer, told plaintiff that he would see if Dr. Dodson could provide "prescription samples, regimens that he believes meet 10 C.F.R. 26." Dodson told Gasser that he was unable to provide a specific level of medications that would allow plaintiff to be fit for duty. In a letter dated October 3, 2006, Gasser informed plaintiff that Dodson would be available to talk with plaintiff's physician to discuss any treatment regimens recommended by his physician to insure the physician has an appropriate understanding of the nuclear industry's requirements. Gasser also told plaintiff he would have someone from safety and health provide a list of doctors who might provide a second opinion.

---

[17]/     Plaintiff argues at length that he made "repeated request[s] to SNC trying to ascertain what medications he could take, what levels, and continue working," but that the defendant did not perform any tests or give him any medication advice. These alleged facts, while germane to a reasonable accommodations claim, are not relevant to his claims of retaliation or hostile environment. Moreover, plaintiff does not assert that he ever sought any advice from his own personal physicians about alternative treatments, substitute medications, or reduced dosages that might render him fit for duty.

Gasser further identified three options for locating doctors in plaintiff's local area, which included Blue Choice Health Care Plan, the EAP Plan Administrator, and plaintiff's treating physician. Plaintiff never informed Southern Nuclear of any doctor from whom he would like to seek a second opinion.

Plaintiff did provide Gasser with a typewritten document, entitled "Appendix F Opioid Conversion Calculation." The document explains how a dosage of oxycodone can be converted to a dosage of morphine. Plaintiff was not taking oxycodone in August 2005 or in April 2006. Southern Nuclear determined that the opioid conversion calculation was not relevant to plaintiff's condition because plaintiff was not taking oxycodone.

Plaintiff made a sworn statement to the Social Security Administration that he became unable to work because of his "disabling condition on April 21, 2006." He further told the Social Security Administration that he could no longer operate a vehicle while traveling in reverse, that he was in excruciating pain every day, and that he could not perform the work he had been doing due to his deteriorating condition. The Social Security Administration determined that plaintiff became disabled effective April 21, 2006, and awarded him SSDI benefits. On October 12, 2006, Southern Nuclear's long-term disability insurance provider, Metlife, approved plaintiff for long-term disability insurance benefits, effective October 18, 2006. On October 18, 2006, plaintiff's employment was changed from FMLA leave and sick time to long-term disability leave. Plaintiff filed a charge of discrimination with the EEOC on October 12, 2006. Southern Nuclear received a copy of plaintiff's EEOC charge for the first time on October 30, 2006. Before October 30, 2006, no one at Southern Nuclear knew plaintiff had filed an EEOC complaint. The EEOC complaint did not mention

Higginbottom, the hand-gun report, the pay reduction, or the denial of a top performer bonus.  The EEOC charge did not mention referral to the company's EAP program or a hostile work environment or harassment.  Plaintiff did not check the box for retaliation on the EEOC charge, and did not mention retaliation.  In his EEOC charge, plaintiff stated that the earliest date the alleged discrimination took place was April 21, 2006.

DISCUSSION

As explained above, there are only two claims properly pleaded in the complaint and before the court.  Despite summary judgment arguments concerning other potential claims, the plaintiff's second amended complaint alleges claims only for hostile work environment based on plaintiff's perceived disability and retaliation for his filing an EEOC charge of discrimination.  Only these claims are discussed below.

**A.  Disability**

To state a claim for relief under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, the plaintiff must "show that he: (1) had a disability; (2) was otherwise qualified to perform the job; and (3) was discriminated against based on his disability."  Collado v. United Parcel Service, Co., 419 F.3d 1143, 1149 (11th Cir. 2005) (citing Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004)); Burgos v. Chertoff, 274 Fed. Appx. 839, 842 (11th Cir., Apr. 23, 2008).  Having a disability is a protected characteristic, comparable to race and gender, for purposes of making a claim for a hostile work environment.  For a hostile work environment claim:

> To establish a prima facie case for a hostile work environment claim, a plaintiff must demonstrate that: (1) she belongs to a protected group; (2) she has been subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and thus create a discriminatorily abusive work environment; and (5) the employer is responsible for that environment under a theory of either direct or vicarious liability. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).

Burgos v. Chertoff, 274 Fed. Appx. 839, 842 (11th Cir., Apr. 23, 2008); see also Dockery v. Nicholson, 170 Fed. Appx. 63, 66-67 (11th Cir., Feb. 7, 2006). Thus, an essential element of element of a hostile work environment case based on disability is that the plaintiff be, in fact, disabled or regarded as disabled within the meaning of the ADA.

The ADA defines a disability as "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); see also Collado, 419 F.3d at 1154.[18] The Supreme Court has noted that "[m]erely having an impairment does not make one disabled for purposes of the ADA." Toyota Motor Mfg. v. Williams, 534 U.S. 184, 195, 122 S. Ct.

---

[18]/    In his opposition to the instant motion, plaintiff seems to alternate his arguments regarding disability. At some points, he asserts that he is disabled due to the severe and constant pain caused by his degenerative discs and other medical conditions. At other times, he asserts that Southern Nuclear mistakenly believed he was disabled, and that he was "regarded" as having a disability. The court treats this claim as one brought under the definition of disability set forth at 42 U.S.C. § 12102(1)(A), however, because plaintiff has himself sworn that he is disabled, and any "perception" of the employer would not be the kind of "erroneous perception" that gives rise to an action under the definition set forth in subsection (C). Hilburn v. Murata Electronics N.A., Inc., 181 F.3d 1220, 1230 (11th Cir. 1999). See also Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1327 n.2 (11th Cir. 1998).

681, 151 L. Ed. 2d 615 (2002).[19]  The Act specifically provides that temporary conditions, even if very severe, are not "disabilities" for purposes of the Act.  42 U.S.C. § 12102(3)(B).  For an impairment to be a disability under the ADA, it must be permanent or long term.  29 C.F.R. § 1630.2(j)(2)(ii)-(iii).  Moreover, to constitute a covered disability, the impairment must "substantially limit" the plaintiff in a "major life activity."  42 U.S.C. § 12102(1)(A). "Substantially" has been defined to mean "considerable" or "to a large degree."  Toyota, 534 U.S. at 196.  Major life activities include such functions as walking, seeing, hearing, speaking, breathing, eating, learning, and working.  29 C.F.R. § 1630.2(i).  In addition to evidence that the plaintiff has a physical or mental impairment, the plaintiff must further demonstrate that the impairment "substantially limits a major life activity."  The term "substantially limits" means that the plaintiff is "[u]nable to perform a major life activity that the average person in the general population can perform" or is "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(i), (ii).  Simpson v. Alabama Dep't. Of Human Resources, 311 Fed.  Appx. 264, 267 (11th Cir. 2009), cert. den., 130 S. Ct. 1014 (2009).  A determination of whether an impairment substantially limits a major life activity requires the court to consider the

---

[19]/     The definition announced in Toyota was superceded by legislation when Congress enacted the ADA Amendments Act of 2008 on September 25, 2008, and the term "substantially limits" was broadened to include a wider range of disabilities.  The conduct at issue in this case took place before the amendments were passed, and therefore the action is governed by the earlier version of the act. See Thornton v. United Parcel Serv., Inc., 587 F.3d 27, 34 n.3 (1st Cir. 2009)(noting that the Amendments Act is not retroactive).  The Eleventh Circuit Court of Appeals has declined to apply the ADAAA retroactively.  Fikes v. Wal-Mart, Inc., 322 Fed. Appx. 882, 883 n.1 (11th Cir. 2009).

"nature and severity of the impairment; ... the duration or expected duration of the impairment; and ... the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(i-iii); Simpson, 311 Fed. Appx. at 267.  Although most ADA cases require intensive discussion of whether the plaintiff is, in fact, disabled, the court will not examine that issue here.  There exists at least a disputed question of fact as to whether plaintiff was disabled.

### B.  "Otherwise Qualified"

The ADA claim in this case turns on the question of whether plaintiff was "otherwise qualified" to work as an emergency planning assistant at Southern Nuclear.  A "qualified individual" under the ADA is an employee who "with or without reasonable accommodation, can perform the essential functions" of the job.  42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(m).  Plaintiff does not dispute that meeting the NRC's fit-for-duty requirement, found at 10 C.F.R. § 26.10, is an essential function of his job.  In this case, plaintiff must demonstrate not only that he was qualified to perform the tasks required by an emergency planning assistant, but also that he could pass a fitness-for-duty evaluation because plaintiff's job fell within the field regulated by the NRC.

At least one district court has found that being fit under the relevant NRC regulation is an essential function of a job in a nuclear power plant.  In Mathieson v. American Electric Power, 2002 U.S. Dist. LEXIS 6560 (W.D. Mich. Jan. 14, 2002), the court granted the defendant's motion for summary judgment against a plaintiff who was discharged after he was found not fit for duty under 10 C.F.R. § 26.10.  In that case, the plaintiff was found not fit for duty because he was taking the

prescription drug Marinol.   In Mathieson, the plaintiff did not dispute that the drug he took was "counterindicated for any person using complex machinery or engaging in activity requiring sound judgment or unimpaired coordination, because of the drug's profound effects on the mental processes."  2002 U.S. Dist. LEXIS 6560 *7-8.  The plaintiff argued instead that the drug did not produce the side effects in him, that his use of the drug had no adverse side effects for him.  The court held, however, that he "produced no evidence indicating that the drug Marinol does not have these effects on human beings."  2002 U.S. Dist. LEXIS 6560 *8 .  The district court adopted the magistrate judge's report and recommendation and granted summary judgment in favor of the defendant.  The court relied upon 10 C.F.R. § 26.10, and noted that "[a] concomitant goal of the regulations is to achieve a 'drug-free workplace and a workplace free of the effects of such substance.'" 2002 U.S. Dist. LEXIS 6560 *7.  The magistrate judge further noted that the defendant "did not choose to implement a fitness-for-duty program, nor did it choose the components thereof," and that the plaintiff's inability to "satisfy a legally dictated fitness-for-duty program is 'by its very nature an essential function.'" 2002 U.S. Dist. LEXIS 6560 *10.

The court in Mathieson considered the issue "conclusively answered" by the Supreme Court in Albertsons, Inc. v. Kirkingburg, 527 U.S. 555, 119 S. Ct. 2162, 144 L. Ed. 2d 518 (1999)(finding that a truck driver who was fired for failing to meet the Department of Transportation vision standards was not a "qualified" individual for purposes of the ADA), and by the Sixth Circuit Court of Appeals in Brickers v. Cleveland Board of Education, 145 F.3d 846 (6th Cir. 1998)(finding that a bus driver who could not meet state law requirements for lifting was not able to perform an essential function of her job, and was seeking 'not an accommodation, but rather an exemption,' and

27

was not otherwise qualified for the job).   In adopting the magistrate judge's recommendation, the district court noted that, although plaintiff argued in his objections that he was willing to stop taking the drug to keep his job, there was "no evidence that plaintiff ever notified defendants of his willingness or ability to stop taking Marinol."  2002 U.S. Dist. LEXIS 3051 *6.

Another federal district court has determined that NRC regulations governing nuclear power plants impose a fitness-for-duty determination that is a "qualification" for the job.  In McCoy v. Pennsylvania Power & Light Company, 933 F. Supp. 438, 443 (M.D. Pa. 1996), the court found a plaintiff not qualified after his security clearance had been revoked pursuant to NRC regulations, noting that the defendant could not allow the plaintiff to work in his job "without compromising its obligation imposed by NRC regulations to supervise carefully employees granted access to secure areas and take steps to restrict access by any employee who poses a potential threat to the safe operation of the plant."   Similarly, in Sysko v. PPL Corp., 2009 U.S. Dist. LEXIS 111869 (M.D. Pa. Dec. 2, 2009),  the court granted summary judgment in favor of the defendant nuclear power plant after finding that a plaintiff's changes in behavior, which ultimately resulted in a medical determination that plaintiff posed a potential security risk, made him unqualified for his job.  The court noted that "[t]o hold otherwise would impose an unreasonable constraint on those charged with safety and security at nuclear power facilities."  2009 U.S. Dist. LEXIS *24.

The court finds the reasoning of the judges in Michigan and Pennsylvania both instructive and persuasive.  In this case, as in Sysko, the defendant had reasons to question Johnson's ability to safely function in the workplace.  He was removed from work only upon recommendations of qualified health care professionals.  Fitness-for-duty under the applicable NRC regulations is an

28

essential function of his job as an emergency planning assistant, and, given the nature of nuclear-plant operations, the NRC standard is a stringent one. To be fit for duty, an employee must meet a "reasonable assurance" that he is "not under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in *any* way adversely affects [his] ability to safely and competently perform [his] duties." The determination that plaintiff failed to meet this standard was reasonable and well-supported by the information available to Southern Nuclear. The number, types, and dosages of prescription medication he was taking, as well as the severity of the medical problems he was experiencing, raised genuine and legitimate questions in the minds of medical personnel as to his fitness for duty under the NRC's regulation. A declaration that he was not fit for duty rendered him unqualified for his position. Accordingly, the plaintiff has failed to demonstrate that he is otherwise qualified for the job, and defendant's motion for summary judgment on any claim premised upon disability discrimination is due to be granted.

### C. Reasonable Accommodation

As discussed above, plaintiff's claim that the defendant failed to provide a reasonable accommodation for his disability has not been pleaded. To the extent, however, the plaintiff could assert such a claim, it also is without merit. It is clear that the duty to provide a reasonable accommodation, under prevailing law, is triggered only where the plaintiff has made a specific demand for an accommodation. Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999)(recognizing that regulations provide that it is "the responsibility of the individual with a disability to inform the employer than an accommodation is needed"). Although plaintiff

asserts that his employer should have concocted some new drug regimen that would both relieve his severe pain and render him "fit for duty," he has failed to identify the accommodation "that actually would have allowed [him] to perform [his] job duties."  Willis v. Conopco, 108 F.3d 282, 284-85 (11th Cir. 1997).  In Willis, the Eleventh Circuit Court of Appeals explained that the ADA placed on the plaintiff the burden of production and persuasion as to a reasonable accommodation that should be made available.  The employee must not only identify the particular accommodation, but also must "establish that such accommodation is reasonable."  108 F.3d at 284.  Where the plaintiff fails to demonstrate "'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant."  108 F.3d at 285.[20]  A plaintiff is required not only to identify the accommodation that should be provided by the employer, but also to demonstrate "that the accommodation allows him to perform the essential functions of the job."  Nadler v. Harvey, slip op. 2007 WL 2404705 *7 (11th Cir. Aug. 24, 2007).

In Nadler, the plaintiff was perpetually tardy based on his difficulty sleeping.  He demanded a modified work schedule that would allow him to come to work at flexible times.  The court held that he had not met his burden of proving that he was otherwise qualified because he "offered no concrete evidence that he could arrive on time or had arrived on time while on a modified compressed work schedule."  2007 WL 2404705 at * 7.  Furthermore, plaintiff's argument that he had been allowed a flexible schedule in the past was not compelling.  The court held that "[d]efendant's past tolerance of plantiff's tardiness is not evidence that plaintiff could arrive on time," and granted the defendant's motion for summary judgment.  2007 WL 2404705 at * 7.

---

[20]/   The Eleventh Circuit Court of Appeals further noted that the "ADA provides no cause of action for 'failure to investigate' possible accommodations."  108 F.3d at 285.

This case is similar to <u>Nadler</u>.  Plaintiff has not demonstrated that there exists any drug regimen or treatment modification that would allow him to work in spite of his pain or to pass the rigorous "fitness for duty" evaluation.  To the contrary, the facts suggest that plaintiff's condition requires large doses of opiates (including morphine sulfate) in order to control his pain, and that the need for such medication has steadily increased over time.  There is nothing to suggest that the doctors prescribed more potent medication than was necessary, or that the dosages of the medications were higher than his condition required. Plaintiff has not produced any evidence that he consulted with any doctors about changing the medication, or that he has tried a different treatment. Certainly, plaintiff does not suggest that his condition could be treated with aspirin or other non-narcotic painkillers.  Common sense, and a review of the medical records provided in this case, suggest that the opiates were prescribed and the dosages increased only in response to an increase in plaintiff's pain and his own conclusion that lower doses or milder drugs were not sufficient to control the discomfort.  To the extent that plaintiff argues, therefore, that the defendant had an affirmative duty to explore different drug regimens, the argument is unpersuasive.  <u>See</u> <u>Willis</u>, 108 F.3d 282, 285 (11th Cir. 1997), <u>see also</u>, <u>McKane v. UBS Financial Services, Inc.</u>, 2010 U.S. App. LEXIS 1386*4 (11th Cir. Jan. 21, 2010).

Plaintiff has failed to specify any reasonable accommodation — other than some hypothetical medication — that would make it possible for him to manage his pain, perform his job, and still meet the strict requirements of the nuclear industry regulations.  Accordingly, to the extent that the two-count complaint could be construed as asserting a claim that defendant has failed to provide him with a reasonable accommodation, the claim is due to be dismissed for this additional reason.

**D.  Judicial Estoppel**

Defendant further contends that plaintiff should be judicially estopped from asserting that he is "otherwise qualified" because he has represented to the Social Security Administration that he is totally disabled.   While the Eleventh Circuit Court of Appeals has specifically found that a plaintiff's assertions of disability in applying for Social Security benefits does not necessarily preclude a plaintiff from pursuing an ADA claim, the doctrine of judicial estoppel can be used as a bar to an employment action.   Judicial estoppel "is applied to the calculated assertion of divergent sworn positions. The doctrine is designed to prevent parties from making a mockery of justice by inconsistent pleadings." McKinnon v. Blue Cross & Blue Shield of Ala., 935 F.2d 1187, 1192 (11th Cir.1991), quoting American Nat'l Bank v. Federal Dep. Ins. Corp., 710 F.2d 1528, 1536 (11th Cir.1983).   The Eleventh Circuit Court of Appeals first examined the question of applying the doctrine to a plaintiff in an ADA case in Talavera v. School Bd. of Palm Beach Cty., 129 F.3d 1214 (11th Cir. 1997).   After engaging in an extensive survey of opinions from other circuit courts of appeal, the court determined:

> We agree with the majority of our sister circuits that a certification of total disability on an SSD benefits application is not inherently inconsistent with being a "qualified individual with a disability" under the ADA. A certification of total disability on an SSD application does mean that the applicant cannot perform the essential functions of her job without reasonable accommodation. It does not necessarily mean that the applicant cannot perform the essential functions of her job with reasonable accommodation. Whether in any particular situation there is an inconsistency between applying for SSD benefits and bringing an ADA claim will depend upon the facts of the case, including the specific representations made in the application for disability benefits and the nature and extent of the medical evidence in the record. However, we do hold that an ADA plaintiff is estopped from denying the truth of any statements made in her disability application. Our basis for this holding is that an

ADA plaintiff should not be permitted to disavow any statements she made in order
to obtain SSD benefits.

133 F.3d at 1220.  The court of appeals examined the actual statements the plaintiff in Talavera made

to the Social Security Administration, and found that her statements "indicate that Talavera felt she

remained able to work" and were "not inconsistent" with the allegations in the ADA lawsuit.  133

F.3d at 1220.   "The determination of whether an individual who has certified total disability to the

SSA is judicially estopped from later bringing a claim under the ADA will depend upon the specific

statement made in the application and other relevant evidence in the record."  Taylor v. Food World,

Inc., 133 F.3d 1419, 1423 (11th Cir. 1998).

The Supreme Court spoke to this issue also, stating:

> Summary judgment for a defendant is appropriate when the plaintiff  "fails to make
> a showing sufficient to establish the existence of an element essential to [her] case,
> and on which [she] will bear the burden of proof at trial." Celotex Corp. v. Catrett,
> 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed.  265 (1986).  An ADA plaintiff bears
> the burden of proving that she is a "qualified individual with a disability"– that is, a
> person "who, with or without reasonable accommodation, can perform the essential
> functions" of her job. 42 U.S.C. § 12111(8). And a plaintiff's sworn assertion in an
> application for disability benefits that she is, for example, "unable to work" will
> appear to negate an essential element of her ADA case – at least if she does not offer
> a sufficient explanation. For that reason, we hold that an ADA plaintiff cannot simply
> ignore the apparent contradiction that arises out of the earlier SSDI total disability
> claim. Rather, she must proffer a sufficient explanation.

Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 806, 119 S. Ct. 1597, 143 L. Ed.

2d 966 (1999).  The explanation offered by the plaintiff must "be sufficient to warrant a reasonable

juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier

statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" 526 U.S. at 807.

In the instant case, the plaintiff averred to the Social Security Administration in 2006 that he "is in excruciating pain every minute of every day," and that he "can not perform the work or activities [he has] currently been doing due to [his] rapid deterioration [sic] and degeneration of all joints in [his] body." (Def.'s Ex. 23 at Doc. 54-6, p.42). He further has stated that the pain "never stops" and he has "no energy to do anything." (Def.'s Ex. 22, at Doc. 54-6, p. 39). He complained that he could not squat, tie his shoes, operate a vehicle in reverse, grip objects for a long time, sleep at night, kneel, hold his head up without taking rest breaks, or sit for long periods. (Id., at p. 34) He asserted in July 2006 that he "became unable to work because of [his] disabling condition on April 21, 2006." (Def.'s Ex. 19, at Doc. 54-6, p. 2). Plaintiff does not deny that he made any of these assertions, and he does not deny that the statements accurately reflect his physical condition. Instead, he argues that he "had no choice but to apply," insinuating that, because Southern Nuclear was no longer paying his salary and had recommended that he apply for long-term disability, plaintiff was then forced to lie. (Plaintiff's Opposition, pp. 45-46).

The burden of demonstrating that he is "otherwise qualified" falls upon the plaintiff. A person is considered "otherwise qualified" if he is able to perform the essential functions of the job. Jackson v. Veterans Admin., 22 F.3d 277, 278 (11th Cir. 1994). Plaintiff has failed to meet his burden of proof and persuasion to demonstrate that he is "otherwise qualified" for his position as an emergency planning assistant at Southern Nuclear.[21] The actual statements he made to the Social

---

[21]/   Plaintiff attempts to shift this burden to defendants, asserting that they had some affirmative duty to consult with doctors and devise a medication plan that would be both so effective and so non-

Security Administration show in fact that he is not able to perform his job at Southern Nuclear, and was not able to do so as of April 2006.  He is judicially estopped to assert today that he is a "qualified individual."   Accordingly, he cannot establish a *prima facie* case of disability discrimination, and his claim is due to be dismissed.

### E.  Harassment and Hostile Environment

#### 1.  Severity and Pervasiveness

Whether a hostile environment claim even exists under the ADA has not been discussed by the parties.  While the court finds that the issue is unsettled, see, *e.g.*, Sykes v. Pinellas Suncoast Transit Authority, 128 Fed. Appx. 100, 101 (11th Cir. 2005), but see Burgos v. Chertoff, 274 Fed. Appx. 839, 842 (11th Cir., Apr. 23, 2008)(stating elements of a hostile work environment claim based on disability); Dockery v. Nicholson, 170 Fed. Appx. 63, 66-67 (11th Cir., Feb. 7, 2006) (same), many courts have applied the Title VII concept to ADA law.  Assuming *arguendo* that such a claim is recognized in this circuit, as the court did in Sykes, the claim is nonetheless without merit.

It is clear that any ADA hostile environment claim would be subject to all the requirements of a *prima facie* showing under a Title VII hostile environment claim.  In order to sustain a Title VII claim for harassment sufficient to create a hostile work environment, the plaintiff must demonstrate that: (1) he is a member of a protected group; (2) he has been subject to harassment

---

narcotic that plaintiff would be able to both function in spite of the severe, constant pain, and to pass the rigors of the mandated drug-screening tests.  Plaintiff concedes, however, that he has never even asked his own treating doctors to find substitutes for the multiple doses of opiates that he requires daily.

based upon the protected status; (3) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) there exists a basis for holding the employer liable.  See Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999), cert. den., 529 U.S. 1068 (2000);  Burgos v. Chertoff, 274 Fed. Appx. 839, 842 (11th Cir., Apr. 23, 2008).  An employer is vicariously liable to a victimized employee where the hostile environment has been created by a supervisor "with immediate (or successively higher)" authority over the employee.  Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662, 689 (1998).

The Supreme Court has recognized that it is not enough for a plaintiff to show that the workplace was offensive; rather, he must show that the office was so permeated with discriminatory intimidation, ridicule, and insult that a reasonable person would perceive the environment as hostile or abusive.  See Meritor Savings Bank v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986).  In determining if this critical element of a hostile environment claim has been met, the court must look to the frequency, severity, and pervasiveness of the conduct complained of.  Again, the court of appeals has said:

> The objective component of this analysis is somewhat fact intensive.  Nevertheless, the Supreme Court and this Court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.  Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris, 510 U.S. at 23, 114 S. Ct. 367). The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's

employment and create a hostile or abusive working environment. Id.; see Harris, 510 U.S. at 23, 114 S. Ct. 367; Henson, 682 F.2d at 904; Faragher, 118 S. Ct. at 2283 (citing Harris, 510 U.S. at 23, 114 S. Ct. 367, and explaining that "we directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances'").

Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999).

In this case, plaintiff attempts to paint as harassment events that began when Higginbottom failed to tell plaintiff that his pay was reduced in 2004. Plaintiff complained about Higginbottom's actions, and the complaint was investigated. He was compensated for the lost pay for that year. His complaint did not allege any form of disability discrimination. Higginbottom, who was aware of plaintiff's medication use, and who awarded plaintiff a "top performer bonus" in 2004 even though he was aware of plaintiff's medical issues, did not award plaintiff a similar bonus in 2005. In February 2005, plaintiff complained about Higginbottom's decision not to award a bonus to him, and complained about other actions Higginbottom had taken, including reporting him for having a gun on company property. The complaint did not allege any form of disability discrimination. After June 2005, plaintiff no longer reported to Higginbottom. Plaintiff attempts to retread his claims against Higginbottom, but this time labeling them as claims of disability discrimination.

There is simply no evidence that any of Higginbottom's actions — even if unfair or motivated by spite or animosity — was related in any way to plaintiff's disability or to any perception of disability. Higginbottom was aware of plaintiff's medical condition in 2002, before he awarded plaintiff the top performer bonus in 2003. Similarly, while plaintiff complains that Higginbottom knew about the possession of the gun long before reporting it as a violation, he does not deny that he brought the gun onto company property or that his conduct was violative of policy.

37

In fact, Higginbottom reported the gun incident seven days after plaintiff brought the gun onto company property.[22]  Again, there is no evidence that the conduct was in any way related to a real or perceived disability.

Plaintiff further suggests that other acts of harassment included requiring plaintiff to undergo medical examinations twice in August 2005. Plaintiff does not dispute that the first two examinations were prompted by reports on his annual review, which Boone wrote with input from Higginbottom,  that plaintiff had become more angry and less sociable during the past year. Plaintiff does not assert that the ASR was in any way motivated by his real or perceived disability. In any event, the result of both medical exams was that plaintiff was allowed to continue in his then-current job, receiving the same pay. These isolated incidents, which reflect nothing more than a poor management style on the part of Higginbottom, are woefully insufficient to create a hostile work environment.[23]  The plaintiff has failed to demonstrate that he was subjected to any severe, pervasive harassment (much less harassment that was motivated by his disability), and the defendant's motion for summary judgment on the hostile environment claim is due to be dismissed for this reason alone.

2.  Timeliness

Prior to filing an employment discrimination act under the ADA, a plaintiff first must exhaust his administrative remedies by filing a charge of discrimination with the EEOC.  42 U.S.

---

[22]/    The undisputed facts show that plaintiff had the gun on July 5, 2005, and Higginbottom reported it on July 12, 2005.   Thereafter, on July 19, 2005, plaintiff complained about Higginbottom's failure to tell him about his pay cut, which led to the investigation of Higginbottom and the restoration of plaintiff's pay level for one year.

[23]/    They also were never raised in any EEOC charge, as discussed *infra*.

§ 12117(a)(applying remedies and procedures of Title VII to ADA).  For a charge to be timely, it must be filed within 180 days of the discriminatory act.  29 U.S.C. § 626(d).  Moreover, the Eleventh Circuit Court of Appeals has explained that  "[t]he starting point of ascertaining the permissible scope of a judicial complaint alleging employment discrimination is the administrative charge and investigation."  Alexander v. Fulton Cty., Ga., 207 F.3d 1303, 1332 (11th Cir. 2000), overruled on other grounds by Manders v. Lee, 338 F.3d 13404 (11th Cir. 2003).  "A plaintiff's judicial complaint is limited by the scope of the EEOC investigation that 'can reasonably be expected to grow out of the charge of discrimination.'"  Ramon v. AT&T Broadband, 195 Fed. Appx. 860, 865, (11th Cir. 2006), quoting Gregory v. Georgia Dep't. of Human Resources, 355 F.3d 1277, 1280 (11th Cir. 2004).   Judicial claims may be permissible where they "amplify, clarify, or more clearly focus" the allegations made in the EEOC charge, but "allegations of new acts of discrimination are inappropriate."  Gregory, 355 F.3d at 1279-80.

The plaintiff's EEOC charge in this case states that the earliest date of any discriminatory act was April 21, 2006, the date on which he was declared unfit for duty.  The latest date of discrimination was  October 12, 2006, the date on which he filed the charge. The charge makes no mention of any issues with Higginbottom, or any complaints about pay, or any of the events plaintiff now alleges constituted a hostile environment.  His EEOC charge clearly complains only that Southern Nuclear's conduct relating to the  medical examination in April 2006 was discriminatory on the basis of a perceived disability.  The charge could be read to encompass Southern Nuclear's conduct in requiring him to see two additional doctors for evaluation in May 2006.  Even so, to the extent that requiring that plaintiff visit additional doctors is the harassing conduct, it cannot be

deemed either so severe or pervasive as to constitute a hostile environment.  Such evaluations of fitness for duty did not alter the terms and conditions of his employment because fitness for duty was a condition of employment required by the NRC.  Similarly, his complaint in the EEOC charge that he asked questions of the company's human resources employees and executive level management and was promised that they would set up appointments for him with doctors about alternative treatments, but that he did not receive any response for six weeks, is not severe or pervasive discrimination.

In response to the motion for summary judgment, plaintiff argues that his claims are timely on the basis of the continuing violation doctrine.  Plaintiff concedes, however, that discrete acts that occur more than 180 days prior to the filing of the EEOC charge are not timely.  (Plaintiff's Brief, Doc. 65, p. 51).  Viewing all of the evidence in the light most favorable to the plaintiff, he simply does not describe an atmosphere of pervasive hostility. Even construing his allegations liberally and in his favor, what he describes were discrete actions carried out by Higginbottom, which are clearly time-barred, and the subsequent conduct by medical staff and/or managers at Southern Nuclear in 2006 that led to a declaration that he was unfit for duty.  Accordingly, even assuming plaintiff is disabled or regarded as disabled, and even if plaintiff had been able to demonstrate that he is otherwise qualified for the job — which he has failed to do — his hostile environment claim based on any actions by Higginbottom still would be subject to summary adjudication in favor of the defendant because the claim is untimely.

3.  Exhaustion

Defendant further asserts that the hostile environment claim is due to be dismissed on the ground that the plaintiff failed to exhaust his administrative remedies in that he did not raise the harassment or hostile environment claim in the EEOC charge.  As a prerequisite to the filing of a lawsuit alleging disability discrimination, a plaintiff first must exhaust his administrative remedies by filing a charge of discrimination with the EEOC.  Maynard v. Pneumatic Products Corp., 256 F.3d 1259, 1262 (11th Cir. 2001).   "A plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Alexander v. Fulton County, 207 F.3d 1303, 1332 (11th Cir.2000).  Allegations of "new acts of discrimination" cannot be raised in a complaint.  Gregory v. Georgia Dep't of Human Resources, 355 F.3d 1277, 1279-80 (11th Cir. 2004).

The court agrees that the EEOC charge filed by Johnson details no workplace events other than  medical examinations ordered by Southern Nuclear from 2005 to 2006.  It makes no mention of any conduct in the workplace that was not related to medical examinations or recommendations regarding his fitness for duty.   Plaintiff cannot now raise claims relating to Higginbottom's management style or failure to award bonuses because those do not in any way "grow out of" the charge.

Consequently, plaintiff's hostile environment claim can be construed only as involving his medical examinations and determinations made from August 2005 to October 2006.  Being required to submit to medical examinations, when admittedly using opiates while on the job, is not the type of unreasonable, severe, or pervasive conduct that is defined under the law as harassment that could

constitute a hostile environment.  Accordingly, the motion for summary judgment on any claim based upon allegations of harassment and/or hostile environment as set forth in Count One of the three complaints governing this action is due to be granted.

### F.  Retaliation

The ADA provides a prohibition on retaliation that is similar to the anti-retaliation provision of Title VII.  42 U.S.C. § 12203(a);  Stewart v. Happy Herman's Cheshire Bridge, Inc., 117 F.3d 1278, 1287 (11th Cir.1997).  Consequently, the court assesses an ADA retaliation claim under the same framework employed in the context of a Title VII  retaliation claim.  Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1328 (11th Cir.1998).  To establish a *prima facie* case of ADA retaliation, a plaintiff must show: "(1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action." 161 F.3d at 1328.  Once a plaintiff has established a *prima facie* case, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001).  "When the defendant produces legitimate nondiscriminatory reasons for the adverse employment action, the burden shifts back to the plaintiff to establish that these reasons were pretextual."  Earley v. Champion Int'l Corp., 907 F. 2d 1077, 1081 (11th Cir. 1990)(citing Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).  "A plaintiff can meet this burden 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"

Tippie v Spacelabs Med., Inc., 180 Fed. Appx. 51, 54 (11th Cir. 2006), *cert. den.*, 549 U.S. 1111 (2009), quoting Burdine, 450 U.S. at 252.  "In determining pretext, we evaluate whether the plaintiff demonstrated 'such weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could find them unworthy of credence.'" Price v. M & H Valve Co., 177 Fed. Appx. 1, 12 (11th Cir. 2007)(quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)).

    "If the plaintiff does not offer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant's articulated reasons is pretextual, the defendant is entitled to summary judgment." Id. (quoting Chapman v. AI Transport, 229 F.3d 1012, 1024-25 (11th Cir. 2000).  "[A] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason, as long as the reason might motivate a reasonable employer." Id. 177 Fed. Appx. at 13 (quoting Pennington v. City of Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001)).  "Stated differently, pretext is not present 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" Johnson v. Switch and Data Mgmt., 199 Fed. Appx. 834, 835 (11th Cir. 2006)(quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S. Ct. 2742, 2752, 125 L. Ed. 2d 407 (1993))(emphasis in original).

    In examining plaintiff's claim of retaliation under the ADA, the court first must examine what acts have timely been raised as retaliatory.[24]  The plaintiff was directed by this court to amend

---

[24]/    The plaintiff's response conflates several events into a statement that "[a]fter complaining [that his supervisor was harassing him,] he was subjected to a drug test and placed off work when he tested positive."  First, it should be noted that plaintiff never complained prior to 2006 that any supervisor was harassing him.  He complained that his supervisor failed to tell him about his pay reduction, and that, after he complained about that, his supervisor retaliated by reporting him for having a handgun.  However, these events occurred in 2004, and were the subject of an internal

the complaint and to "more specifically describe (1) the complaints he made (stating the approximate date of the complaints, the manner in which the complaints were made, and to whom the complaints were made) and (2) which specific employment actions or decisions he claims were taken against him in retaliation for the exercising of his right to complain of alleged disability discrimination." (Doc. 18).  The Second Amended Complaint set forth only one protected activity by date and description: the filing of an EEOC charge on October 12, 2006, and one retaliatory act: the removal from duty, by placing plaintiff on long-term disability, on October 18, 2006.  (Second Amended Complaint, ¶ 25).[25]  In plaintiff's response to the motion for summary judgment, however, he argues an entirely separate complaint: the completion in January 2006 of a Compliance Questionnaire in which plaintiff asserted that Higginbottom had discriminated against him. Because it was never pleaded, it need not be addressed here.

Even if the January 2006 "complaint of discrimination" in the Compliance Questionnaire could be argued as a basis of a retaliation claim, defendant still would be entitled to summary judgment on that claim because it has articulated a non-discriminatory reason for the action, which plaintiff has failed to show was pretextual.  Defendant has alleged that the decision to remove

---

complaint that made no mention of any disability or of any form of illegal discrimination.  Because the complaint was never premised on any illegal discrimination, the internal complaint lodged against Higginbottom cannot be deemed a protected activity.  Moreover, the 2004 events were never the subject of any EEOC charge, and cannot be raised here because they are time-barred and unexhausted.

[25]/     Plaintiff also argues that he engaged in a protected activity in January 2006 when he filled out a Compliance Questionnaire in which he complained that he had been discriminated against.  No such claim was pleaded, or was made the subject of any EEOC charge, and therefore is unexhausted. To the extent that such a claim is viable in this case, however, it still would be due to be dismissed because plaintiff has failed to demonstrate that any decision-maker involved in the plaintiff's removal from duty was even aware of plaintiff's comments on the questionnaire.

plaintiff from his position was reached because defendant was bound by federal regulations to evaluate employees' fitness for duty, and that plaintiff's medical condition rendered plaintiff unfit for duty under the relevant NRC regulations.[26]  Defendant points to the version of 10 C.F.R. § 26.10 in effect at the relevant time,  which provides:

> Fitness-for-duty programs must:
> (a) Provide reasonable assurance that nuclear power plant personnel, transporter personnel, and personnel of licensees authorized to possess or use formula quantities of SSNM, will perform their tasks in a reliable and trustworthy manner and are not under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties;
> (b) Provide reasonable measures for the early detection of persons who are not fit to perform activities within the scope of this Part; and
> (c) Have a goal of achieving a drug-free workplace and a workplace free of the effects of such substances.

10 C.F.R. § 26.10.  Defendant further has provided factually similar cases in which removal from an NRC-governed job was proper where the plaintiffs were taking narcotic or psychoactive medications.  (Def.'s Brief, at pp. 35-38).[27]

---

[26]/ Defendant's argument relating to this retaliation claim is addressed within the section of its brief describing "discrimination" as opposed to "retaliation," but nevertheless serves as the articulation of a legitimate, non-retaliatory reason for the adverse action.

[27]/ Plaintiff points the court to two unpublished district court opinions, Haynes v. City of Montgomery, 344 Fed. Appx. 519 (11th Cir. 2009), and McKenzie v. City of Hoover, case no. 2:09-cv-69-LSC, in the United States District Court for the Northern District of Alabama. Haynes deals with a perception of disability, not retaliation, and includes the fact that "other firefighters who were taking similar medication were not terminated or placed on leave."  344 Fed. Appx. at 520.  McKenzie also examines only the disability issue, and not a claim of retaliation, and applies a stricter test of fitness which requires a finding that the employee poses a "direct threat."  Neither of these cases applied the NRC mandated "fitness for duty" regulation, and are therefore distinguishable.  For these and other reasons, the cases relied upon by plaintiff are unpersuasive.

Plaintiff does not dispute that the regulations require defendants to implement fitness-for-duty evaluations or to employ only those who are fit for duty; rather, plaintiff asserts that the termination of his employment,[28] based on a determination that plaintiff was unfit, was retaliatory. Because the defendant has articulated that compliance with the regulation is the nondiscriminatory reason for its conduct in removing plaintiff from the workplace, the burden now rests with the plaintiff to show that the reason is a pretext.

Plaintiff has offered no evidence that the defendant's proffered reason for removing him from work is unworthy of credence. Plaintiff has not offered any evidence that the drug test that resulted in the finding that he was unfit for duty was in any way retaliatory.[29] The plaintiff does not dispute that the "fit for duty" determination was ultimately made by Dr. Dodson, or that Dodson relied upon information from plaintiff's own doctors, plaintiff's own statements, and the assessments of other medical professionals familiar with NRC regulations. Dodson's undisputed testimony is that he did not know that the plaintiff had complained of any type of discrimination when he declared plaintiff unfit for duty in 2006. (Dodson Depo., Def.'s Ex. 4, pp. 194-96). The plaintiff's argument boils down to two essential elements: he alleges that Dodson should have demanded some proof that the medications did in fact cause deleterious side effects in the plaintiff, and that the fact that he had

---

[28]/ It should be noted that this case does not involve an actual firing or termination, but the result – that plaintiff is not working and is not being paid by Southern Nuclear – is the same.

[29]/ Here again, plaintiff attempts to obfuscate. He makes multiple assertions that his drug tests ordered in 2005 were motivated by some sort of animus. But the 2005 drug tests did not result in any adverse action. It is undisputed that he was chosen for the March 2006 test at random.

passed previous fitness screenings in spite of taking similar drugs[30] requires the result that he should have passed the 2006 test.  As to the former element, arguing that Dodson should have explored whether plaintiff's medications resulted in actual impairment turns the NRC requirement of reasonable assurance on its head.  Under the NRC requirement, the employer must reasonably assure the employee's fitness for duty, not simply assume his fitness under circumstances indicating the employee's heavy use of psychoactive medication.  For far as the latter argument — that he passed the August 2005 screening — such past success cannot assure future fitness for duty, particularly where it is undisputed that the plaintiff's medications changed over that time.

Absent any evidence that Dodson's given reason for finding plaintiff unfit for duty was a pretext, the defendant is entitled to summary judgment on the retaliation claim.  In this case, the court is persuaded by the reasoning set forth in Mathieson, 2002 U.S. Dist. LEXIS 6560 *7-8.  It is sufficient that those making fit-for-duty determinations rely upon established medical information about the known side effects of a drug, and does not impose a duty for every employee to be subjectively examined.   The law does not impose upon Dodson that he ignore his own medical judgment in assessing the known side effects of the multiple drugs taken by plaintiff.  Dodson, and the other doctors, have clearly stated that several of the medications, even taken alone, cause drowsiness and sedation — a conclusion that the plaintiff does not dispute.[31]  Plaintiff argues that,

---

[30]/ Plaintiff continually asserts that his opiate levels were just as high in previous tests.  He does not, however, dispute that the list of medications and dosages had increased, and included two types of morphine that had not been listed in earlier tests.

[31]/ In his deposition, Dodson explains that morphine, Nuerontin, Clonazapam, Tizanidine, Ambien and Zoloft all can cause drowsiness, and that the effects can be even more severe and unpredictable when sedating drugs are used in combination.

in the absence of any proof that he was behaving as if he were sedated while at work, the defendant was required to assume that he was not under the influence of the many drugs he was admittedly taking.  Plaintiff attempts to impose upon the employer a presumption that sedating drugs do not sedate any particular patient.  Such a conclusion is at odds with the requirement of the 10 C.F.R. § 26.10(c), which sets as a goal a workplace free of drugs and the effects of drugs.  Likewise, it turns the "reasonable assurance" standard on it head, prohibiting the employer from relieving an employee unless there is clear evidence of impairment, even if the employer cannot reasonably assure that the drugs will not have an impairing effect.

Accordingly, for the reasons discussed herein, the sole retaliation claim that is adequately pleaded is due to be dismissed as abandoned because plaintiff failed to address that claim (based upon the filing of the EEOC charge) in his opposition brief.  To the extent that plaintiff could assert a claim based on the January 2006 questionnaire, that claim was unexhausted because he did not raise it in his EEOC charge, and further is without merit because plaintiff has failed to demonstrate that the articulated, nondiscriminatory reason for the removal from duty was pretext. The evidence pointed to by the plaintiff is either conclusory or insufficient. There is no evidence that any decision-maker harbored any retaliatory motive.  Therefore, the defendant's motion for summary judgment on the retaliation claim is due to be granted.

<u>CONCLUSION</u>

Based on these undisputed facts and the legal principles discussed above, the defendant's

motion for summary judgment will be granted, and this action will be dismissed by separate order.

DONE this 25th day of September, 2010.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE